Hillsborough-northern judicial district
No. 2011-516

SUSAN JEFFERY

v.

CITY OF NASHUA

Argued: March 13, 2012
Opinion Issued: June 12, 2012

*Molan, Milner & Krupski, PLLC*, of Concord (*Richard E. Molan* on the brief, and *John S. Krupski* orally), for the plaintiff.

*Jackson Lewis LLP*, of Portsmouth (*Debra Weiss Ford* and *Elizabeth J. Baker* on the brief, and *Ms. Baker* orally), for the defendant.

CONBOY, J. The plaintiff, Susan Jeffery, appeals an order of the Superior Court (*Tucker*, J.) granting summary judgment in favor of the defendant, the City of Nashua (City), on her wrongful discharge and breach of contract claims. We affirm.

The following facts are drawn from the record. In 1977, the plaintiff began working in the City's payroll department. In or around 1998, she became the City's risk manager. In 2004, the plaintiff became concerned that her direct supervisor, Maureen Lemieux, did not understand the budgetary process because "she wanted to level fund the health line items" in the City's 2005 fiscal year budget. The plaintiff raised her concerns with Lemieux "dozens of times," but Lemieux responded that "she was comfortable with her numbers."

In April 2005, the City discovered that the health insurance line item was underfunded. Consequently, the Board of Aldermen convened an *ad hoc* health care budget committee to investigate the circumstances leading up to the shortfall. The plaintiff alleges that between her two interviews with the committee, she was summoned to a meeting with the mayor, at which he asked her whether she, as department manager, should be held responsible for the budget shortfall. The plaintiff refused to accept responsibility, explaining that she had tried to prevent the error by raising her concerns with Lemieux and others. The plaintiff also alleges that on a separate occasion, the mayor suggested that they "all share the blame," but she refused his suggestion.

In November 2005, the committee issued its final report, concluding that the City's budget shortfall was a consequence of its insufficient "long term experience with self funded Health Insurance account" and its lack of training and educational opportunities for staff. In the report, the committee also made specific recommendations, some of which were the plaintiff's responsibility to implement as risk manager. The plaintiff did not implement all of the committee's recommendations.

At some point in 2005, the plaintiff noticed that her relationship with Lemieux was becoming strained. Although she concedes Lemieux never

said or did "anything" to her, she contends that "things were very tense." As a result, she became fearful that she would be discharged.

In February and March 2006, the plaintiff received two written warnings from Lemieux. Prior to these warnings, she had never been "written up" in her twenty-nine years of employment with the City. Following the second warning, the risk management department was reorganized and some of the plaintiff's job duties and supervisory responsibilities were shifted to the newly created position of deputy risk manager. In June 2006, Lemieux conducted the plaintiff's performance evaluation, wherein she noted several areas requiring improvement. Consequently, Lemieux denied the plaintiff a raise.

In September 2006, the City learned that checks totaling almost one million dollars were left unsecured in the plaintiff's department, in violation of the City's Cash Control and Handling Policy. As a result, she was placed on a one week unpaid disciplinary suspension. In addition, she was demoted from risk manager to employee benefits specialist. Shortly after being notified of these latest disciplinary actions, the plaintiff took a leave of absence under the Family and Medical Leave Act (FMLA), *see* 29 U.S.C. §§ 2601 *et seq.* (2009 & Supp. 2011). On December 21, 2006, while still on FMLA leave, the plaintiff submitted a letter of resignation, stating her decision to retire early. The letter indicated that the effective date of her resignation was December 31, 2006.

On December 29, 2009, three years and eight days after her letter of resignation, the plaintiff brought suit against the City, alleging constructive discharge and breach of contract. The City moved for summary judgment, arguing, among other things, that her claims were untimely. The trial court granted the City's motion, and this appeal followed.

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RSA 491:8-a, III (2010). In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *Waterfield v. Meredith Corp.*, 161 N.H. 707, 709 (2011). If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. *Id.* "[T]he adverse party may not rest upon mere allegations or denials of his pleadings, but his response, by affidavits or by reference to depositions, answers to interrogatories, or admissions, must set forth specific facts showing that there is a genuine

issue for trial." RSA 491:8-a, IV (2010). We review the trial court's application of the law to the facts *de novo. Waterfield*, 161 N.H. at 709.

*I. Constructive Discharge*

 The plaintiff first argues that the trial court erred by ordering judgment against her on her constructive discharge claim based upon its finding that this claim is barred by the three-year statute of limitations applicable to personal actions. *See* RSA 508:4, I (2010) (providing that, subject to the discovery rule exception, "all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of . . . ."). A cause of action arises, thereby triggering the running of the three-year period, once all the elements necessary for such a claim are present. *Singer Asset Finance Co. v. Wyner*, 156 N.H. 468, 477-78 (2007). Although we have held that to establish liability for constructive discharge, a plaintiff must show that her employer rendered her working conditions so difficult and intolerable that a reasonable person would feel forced to resign, *Porter v. City of Manchester*, 151 N.H. 30, 42 (2004), we have not decided when such a claim accrues.

The plaintiff acknowledges that "the majority of jurisdictions hold that the limitations period begins to run when the employee has given notice of intent to resign." Here, the plaintiff gave such notice on December 21, 2006, more than three years before filing suit. Nevertheless, citing *Mac's Shell Service v. Shell Oil Products*, 130 S. Ct. 1251 (2010), she urges us to adopt a rule "that the statute of limitation begins to run on the *actual* date of termination," which she asserts here is the date she selected as the effective date of her resignation, December 31, 2006. She contends that this rule "will serve . . . the purposes of the statute of limitations," and "comport[ ] with the constitutional mandate of access to justice."

In *Mac's Shell Service*, franchisees alleged that a petroleum franchisor violated the Petroleum Marketing Practices Act (Act), 15 U.S.C. §§ 2801 *et seq.* (2009), by constructively terminating service-station franchises and constructively failing to renew franchise relationships. *Mac's Shell Service*, 130 S. Ct. at 1254. Despite their claims, however, none of the franchisees abandoned their franchises or rejected renewal agreements. *Id.* at 1254-55. Addressing the constructive termination claim first, the Supreme Court analyzed the Act's provision that " 'no franchisor . . . may . . . terminate any franchise,' except for an enumerated reason and after providing written notice." *Id.* at 1257 (quoting 15 U.S.C. § 2802(a)-(b)). The Court explained that the term "terminate" means to "put an end to," and that "cancel," which the Act specifically incorporated into the term "termination," means to "annul or destroy." *Id.* (quotations omitted). Thus, the Court concluded, "a franchisee cannot recover for constructive termination under the [Act] if

the franchisor's allegedly wrongful conduct did not compel the franchisee to abandon its franchise." *Id.* at 1255. The Court explained that "[r]equiring franchisees to abandon their franchises before claiming constructive termination is also consistent with the general understanding of the doctrine of constructive termination." *Id.* at 1258. Drawing on the analogous doctrine, the Court noted that "[t]o recover for constructive discharge, . . . an employee generally is required to quit his or her job." *Id.* at 1258. The Court further explained that in both instances, the legal relationship has ended. *See id.* at 1258-59. Based on this dicta, the plaintiff contends that a cause of action for constructive discharge accrues when the legal relationship ends. We are not persuaded.

Though of first impression in New Hampshire, several other jurisdictions have addressed this legal issue. *See, e.g., Daniels v. Mutual Life Ins. Co.*, 773 A.2d 718, 721-22 (N.J. Super. Ct. App. Div. 2001) (collecting cases); *Clark v. State*, 754 N.Y.S.2d 814, 817 (App. Div. 2003) (holding claim accrued when employee tendered letter of resignation, not when resignation became effective); *UTMB v. Hohman*, 6 S.W.3d 767, 774 (Tex. App. 1999) (holding employees' claims accrued on the dates they submitted their resignations because "[b]y those dates, they were aware that conditions had become intolerable and that they felt compelled to resign").

In *Flaherty v. Metromail Corp.*, 235 F.3d 133, 134-35 (2d Cir. 2000), the plaintiff employee appealed the district court's order granting summary judgment in the employer's favor on the ground that her constructive discharge claim was time-barred. The district court concluded that the claim accrued "when [the plaintiff] was given definite notice of her impending termination," *i.e.*, when she "received a warning letter following a series of allegedly discriminatory acts" by her employer. *Flaherty*, 235 F.3d at 135. On appeal, the Second Circuit vacated the district court's order, holding that since her claim did not accrue until "she gave definite notice of her intention to retire," it was not time-barred. *Id.* at 138. The court explained that although there is generally not "a discrete, identifiable act" in constructive discharge cases, *id.* at 138, when "the employer discriminates against an employee and purposely makes the employee's job conditions so intolerable that a reasonable person would feel forced to resign, then the resignation is a . . . distinct discriminatory act for which there is a distinct cause of action." *Id.* (quotation omitted). Because "[i]n the case of constructive discharge, it is only the employee who can know when the atmosphere has been made so intolerable . . . that the employee must leave," *id.*, the court concluded that the claim accrued on the date the employee gave definite notice of her intention to retire. *Id.* at 138-39.

The Kansas Supreme Court reached a similar conclusion in *Whye v. City Council for the City of Topeka*, 102 P.3d 384 (Kan. 2004). There, the plaintiff

employee appealed the district court's dismissal of his constructive discharge and 42 U.S.C. § 1983 (2000) claims, arguing that neither claim accrued until the effective date of his retirement. *Whye*, 102 P.3d at 385. The supreme court rejected the plaintiff's argument and affirmed the district court's dismissal of his claims as time-barred. *Id.* at 387-88. Adopting the reasoning of the New Jersey Superior Court in *Daniels*, 773 A.2d at 721, the court explained:

> The harm has been done when the employee feels compelled to resign. In short, in an actual termination situation, the retaliatory action which starts the running of the period of limitations is the separation from work. In a constructive discharge situation, the retaliatory action is the creation of intolerable conditions which a reasonable employee cannot accept. The conditions become intolerable when the employee tenders his or her resignation. Thus, by definition, the act of discrimination cannot occur any later than the date of resignation.

*Whye*, 102 P.3d at 387 (quotations omitted). Thus, the court concluded, "the cause of action accrues and the statute of limitations begins to run when the plaintiff tenders his or her resignation or announces a plan to retire." *Id.*; *see Patterson v. State, Dept. of Health*, 256 P.3d 718, 725 (Idaho 2011) (plaintiff's claim for constructive discharge arose "when she provided unequivocal notice of her intent to resign").

■ ■ We find the reasoning in these cases persuasive. Whereas in a wrongful discharge action, the action triggering the limitations period is the separation from work, here, "the retaliatory action is the creation of intolerable conditions which a reasonable employee cannot accept." *Daniels*, 773 A.2d at 721. Thus, once "a reasonable employee is compelled to resign due to the employer's action," a constructive discharge has occurred, and "the act of discrimination cannot occur any later than the date of resignation." *Id.*; *see id.* at 722 (noting "[t]here are no reported decisions that have held that a constructive discharge claim accrues after the employee tenders a resignation."). We conclude, therefore, that an action for constructive discharge accrues when the employee tenders the resignation or retirement notice.

Here, the three-year limitations period for the plaintiff's constructive discharge claim began to run on December 21, 2006, the date she tendered her resignation. She did not commence suit, however, until December 29, 2009, more than three years later. Accordingly, the claim is barred by the statute of limitations.

*II. Breach of Contract*

The plaintiff also contends that the trial court erred in ordering judgment against her on her breach of contract claim. She argues that the City's "employee handbook, which specifically states that the City may only terminate 'for cause' and that it would follow a progressive discipline system, created a contractual relationship" between her and the City, and that the City breached that contract when it constructively discharged her. Although the City argued to the trial court, as it does on appeal, that the plaintiff's contract claim is also time-barred, the court did not address the timeliness issue, but ruled instead that the plaintiff had not established a contractual relationship between the parties.

Assuming without deciding that the employee handbook created an enforceable employment contract between the plaintiff and the City, her claim nevertheless fails as untimely. Under New Hampshire law, a contract claim must be brought within three years of the time the cause of action arises — that is, when the breach occurs. *Coyle v. Battles*, 147 N.H. 98, 100 (2001); *see* RSA 508:4, I. Here, the plaintiff contends that the alleged breach occurred when she was "constructive[ly] terminat[ed] from employment on January 1, 2007." However, the alleged breach — the plaintiff's constructive discharge — occurred when she submitted her December 21, 2006 resignation letter. Thus, the plaintiff's contract claim, asserted in her December 29, 2009 writ, is also time-barred.

*Affirmed.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.